IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ROLAND CECIL McRAE,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀CIVIL NO. 11-00361-CG-N
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
JOHN KNAPP, et. al.,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀Defendants.⠀⠀⠀⠀⠀)

## ORDER

This matter is before the court on the motion for summary judgment of the defendants, John Knapp ("Knapp") and the Alabama Department of Conservation and Natural Resources ("ADCNR").

On June 9, 2011, the plaintiff, Roland Cecil "Mack" McRae ("Mack McRae" or "McRae"), filed his first amended complaint against Knapp and the ADCNR in the Circuit Court of Mobile County, Alabama, alleging (1) a state law claim of assault and battery against Knapp in his individual capacity and his official capacity as an ADCNR officer; (2) a state law claim of false imprisonment against Knapp in his individual and official capacities; (3) a state law claim of negligent and wanton hiring against the ADCNR; (4) a state law claim of negligent and wanton training against the ADCNR; (5) an excessive force claim against Knapp in his individual and official capacities as well as against the ADCNR, pursuant to 42 U.S.C. § 1983;

1

and (6) a separate § 1983 claim against the ADCNR, alleging that Knapp's use of excessive force was done pursuant to ADCNR policy.  (Doc. 1, pp. 65-70).

On July 6, 2011, Knapp and the ADCNR removed the case to this court. Subsequently, on May 7, 2012, the defendants filed the instant motion for summary judgment.  For the reasons enumerated below, the defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.    FACTUAL BACKGROUND

For summary judgment purposes, the court's analysis must begin with a description of the facts in the light most favorable to McRae, who is the non-moving party.  See Skrtich v. Thornton, 280 F.3d 1295, 1299 (11th Cir. 2002).

On June 10, 2010, the Alabama Department of Conservation and Natural Resources ("ADCNR") issued an order closing the waters of the Mississippi Sound to fishing due to encroaching crude oil that had spilled into the Gulf of Mexico during the Deepwater Horizon disaster.  (Doc. 73, p. 7-8).  At 4:34 p.m., two ADCNR conservation officers, the co-defendant, John Knapp ("Knapp") and his partner, Monique Ard ("Ard"), received the order and began to patrol the state docks at Bayou La Batre before proceeding towards Dauphin Island.  (Doc. 74-12, p. 7). While driving to Dauphin Island, Knapp and Ard came upon the Cedar Point Fishing Pier, which is owned by McRae.  Id. at 8.  Seeing that people were fishing off of the pier in waters that were now closed to fishing, Knapp and Ard stopped, printed out a copy of the ADCNR order in their truck, and went inside the Cedar Point Pier office/bait shop (the "bait shop").  (Doc. 70-1, p. 11), (Doc. 74-2, p. 3).

2

At 9:30 p.m., when Knapp walked into the bait shop, the plaintiff's son, Steve McRae, was working behind the counter.  (Doc. 74-2, p. 3).  Knapp told Steve McRae that "I've got bad news for you.  I'm here to close the pier."  Id. at 4.  Steve McRae asked Knapp why he had to close the pier, and Knapp replied that the waters were closed, showing him a "crude map" that delineated which waters were closed.  Id. at 5.  Steve McRae then telephoned his father, who lives across the street from the pier, and informed him that "Conservation [is] over here to close the pier."  Id. at 7.  Plaintiff McRae responded that he would be right over.  Id.

At this point, the conservation officers' version of events diverges from the McRaes' version (both father's and son's).  Steve McRae stated that he recalls Knapp and Ard waiting on the porch of the pier's office/bait shop and, "the next thing I remember was Officer Knapp shouting down to my father that the pier was now closed."  Id. at 8.  Mack McRae stated that as he walked over to talk to Knapp, "as I hit the concrete where the ramp begins, Officer Knapp … hollered down, "As of this moment your pier is closed."  (Doc. 74-1, p. 212).  Mack McRae responded that "[y]ou do not have the authority to close the pier," and stated that he "detected a great deal of testosterone when I told Officer Knapp that.  It – I should probably have rephrased it because it was sort of like a challenge."  Id. at 213.

In the bait shop, Steve McRae then walked around the counter and stood in the doorway where he could watch the interaction between his father and Knapp.  (Doc. 74-2, p. 9).  McRae asked Knapp why the pier was to be closed and what the boundaries of the closure were.  Id.; (Doc. 74-1, p. 213).  After Knapp told McRae

that the waters to the west of the Dauphin Island Bridge were closed to fishing, and the waters to the east of the bridge were still open to fishing, McRae commented that patrons of the Cedar Point Pier could cast their lines under the bridge, thereby complying with the order.  (Doc. 74-2, pp. 12-13).

At this point, observing that his father was upset and that his voice "was elevated slightly," [1] id. at 15, Steve McRae stated that he stepped between his father and Knapp.  Id. at 13.  However, Steve McRae denies that there was anything unusual about his father's facial expressions and denied that his father was doing anything with his body.[2]  Id. at 15.  According to Steve McRae, Knapp "put his hand on my shoulder, told me to step out of the way, I was interfering with a law officer."  Id. at 14.  Steve McRae complied with Knapp's order.  Id.

Mack McRae testified that he then asked Knapp to specify latitude and longitude of the closure, at which point Knapp said, "I've had enough of your shit, turn around and put your hands on the wall."  (Doc. 74-1, p. 213).  Mack McRae turned around, looked at an ice machine that was situated on the pier, then turned around again and said to Knapp "there is no wall."  Id. at 214; Doc. 74-2, p. 16. Knapp responded, "I said turn around and put your hands on the wall."  Id.  Mack McRae repeated, "There is no wall."  (Doc. 74-1, p. 214).

---

[1] It is undisputed that McRae is hard of hearing and wears hearing aids.  He asserts, and the defendants do not dispute, that the volume on his hearing aids was turned down and this caused him to speak loudly.  (Doc. 74-1, p. 212).  The court notes that this may also have been the reason that Knapp was "shouting" at McRae, i.e., he needed to speak loudly in order to be heard.

[2] Knapp alleges that Mack McRae "chest bumped" Knapp during this exchange. (Doc. 70-1, p.13).

At this point, according to both McRaes, Knapp grabbed Mack McRae's left hand, and McRae "pulled his hand back instinctively." (Doc. 74-2, p. 18; Doc. 74-1, p. 214). Knapp then reached for McRae's hand again, and "bear-hugged him, [and] slammed him to the ground." (Doc. 74-2, p. 19). As McRae fell, he hit his head on a wooden post, causing significant bleeding. (Doc. 74-1, p. 215). Tommy Cooke, another witness to the incident, testified that Knapp "grabbed [McRae] by the shirt collar and … by the pants and was going to slam him on the ground, but he slammed him into the pole," adding that Knapp lifted McRae high enough that McRae was horizontal to the ground. (Doc. 74-3, p. 14). Knapp then "came down on top of McRae, putting his knees into McRae's leg and back." (Doc. 73, p. 11) (citing Doc. 74-1, p. 215). At this point, Knapp placed a handcuff on McRae's left hand and told McRae to "[g]ive me your other hand." (Doc. 74-1, p. 178). McRae responded that he could not comply because Knapp was on top of him, at which point McRae states that Knapp stood up and lifted him by the handcuff that was affixed to McRae's left hand, causing "very large abrasions" on his arms. Id., (Doc. 73, p. 11).

## II.   SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of some evidence to

support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Bailey v. Allgas, Inc., 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting Anderson, 477 U.S. at 249).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." See Anderson, 477 U.S. at 251-252.  The moving party bears the burden of proving that no genuine issue of material fact exists.  O'Ferrell v. United States, 253 F.3d 1257, 1265 (11th Cir. 2001).  In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in its favor.  Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999).  "If reasonable minds might differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Hinesville Bank v. Pony Exp. Courier Corp., 868 F.2d 1532, 1535 (11th Cir. 1989) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(a), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden

of proof at trial." <u>Howard v. BP Oil Co.</u>, 32 F.3d 520, 524 (11th Cir. 1994)(<u>citing</u>

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986)).  Otherwise stated, the non-

movant must "demonstrate that there is indeed a material issue of fact that

precludes summary judgment." <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608

(11th Cir. 1991).  The non-moving party "may not rely merely on allegations or

denials in its own pleading; rather, its response .... must be by affidavits or as

otherwise provided in this rule be set out specific facts showing a genuine issue for

trial." <u>Vega v. Invsco Group, Ltd.</u>, 2011 WL 2533755, *2 (11th Cir. 2011).  "A mere

'scintilla' of evidence supporting the [non-moving] party's position will not suffice;

there must be enough of a showing that the jury could reasonably find for that

party." <u>Walker v. Darby</u>, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).

"[T]he nonmoving party may avail itself of all facts and justifiable inferences in the

record taken as a whole." <u>Tipton v. Bergrohr GMBH-Siegen</u>, 965 F.2d 994, 998

(11th Cir. 1992).  "Where the record taken as a whole could not lead a rational trier

of fact to find for the non-moving party, there is no genuine issue for trial."

<u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)

(internal quotation and citation omitted).

### III.   <u>LEGAL ANALYSIS</u>

**A.    § 1983 EXCESSIVE FORCE CLAIM  AGAINST KNAPP AND THE ADCNR**

      **1.)    FOURTH VERSUS FOURTEENTH AMENDMENT VIOLATION**

To begin with, the defendants assert that they are entitled to summary

judgment on the § 1983 claims because McRae's complaint makes reference only to

7

the Fourteenth Amendment, whereas claims of excessive force during an arrest or seizure arise under the Fourth Amendment.  (Doc. 69, pp. 10-11) (quoting Calhoun v. Thomas, 360 F.Supp.2d 1264 1270 (M.D. Ala. 2005)).  In other words, the defendants argue that McRae failed to state a claim upon which relief can be granted.  See Doc. 69, p. 11 ("Whether by mistake or design, the failure to plead a cause of action pursuant to the Fourth Amendment is fatal to the plaintiff's excessive force claim.")  Such an argument is properly raised in a Rule 12(b)(6) motion to dismiss and not a Rule 56 motion for summary judgment.  Hy Kom Development Co. v. Manatee County, 837 F.Supp. 1182, 1185 (M.D. Fla. 1993).

While there can be no doubt that this was a flaw in McRae's pleading (for McRae himself unsuccessfully sought to amend his complaint after the defendants filed their motion for summary judgment), McRae's complaint nevertheless meets the now well-established standard set forth in Iqbal v. Ashcroft, 129 S.Ct. 1937, 1949 (2009), by alleging "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  Even without amendment, the complaint goes beyond a "formulaic recitation of the elements," id. at 1951, and states specific factual allegations regarding the use of excessive force by Knapp which are sufficient for the court to conclude that the claim, if accepted as true, "is plausible on its face." id. at 1949.  The complaint and the pleaded facts it contains were sufficient to place the defendants on notice that McRae was pursuing a § 1983 excessive force claim, which invokes the protection of the Fourth Amendment, even if the magic words "Fourth Amendment" were missing from the Complaint.

Accordingly, this cannot be a basis for granting summary judgment to the defendants.

**2.)     QUALIFIED IMMUNITY – KNAPP IN HIS INDIVIDUAL CAPACITY**

Knapp argues that he is entitled to qualified immunity for the § 1983 claim brought against him in his individual capacity (Count Five).  (Doc. 69, p. 20).  In civil rights actions brought under § 1983, the doctrine of qualified immunity "offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' "  Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  The Eleventh Circuit adopts a multi-step, burden shifting qualified immunity analysis – in order to receive qualified immunity, the public official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."  Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted).

**(a)     KNAPP'S DISCRETIONARY AUTHORITY**

Here, McRae argues that Knapp exceeded his discretionary authority because "he overstepped an otherwise lawful Order (to close the waters to fishing) by unlawfully taking steps to close down the Plaintiff's pier and business entirely." (Doc. 73, p. 3).  In other words, even though the ADCNR order mandated that the waters of the Mississippi Sound were closed to fishing, the Cedar Point Pier could have remained open to patrons who wished to stroll along the pier or purchase food

and drink from the bait shop, as long as they did not actually fish off of the pier. (Doc. 73, p. 16); (Doc. 74-1, p. 147).  As evidence that Knapp did more than simply stop people from fishing, McRae points to Knapp's alleged statement to Steve McRae that "I'm here to close the pier," (Doc. 74-2, p. 4), and his alleged statement to Mack McRae that "[a]s of this moment, your pier is closed," (Doc. 74-1, p. 156).

The defendants argue that "[McRae] does not identify what steps Officer Knapp took to close down the plaintiff's business entirely, other than Officer Knap saying he was there to close the pier," (Doc. 83, p. 5), and that "a reasonable interpretation of [Knapp's] statement would be that the pier was *closed to fishing*, particularly in light of the fact that less than a week before the incident, [McRae] gave an interview to a local news station wherein [he] discusses officials closing Gulf waters 'to fishing.' "  Id. at 6 (emphasis added).  The defendants also argue that the undisputed fact that McRae questioned Knapp about the latitude and longitude of the closings indicate a clear understanding of the scope of the ADCNR order.  Id. at 6.

Upon this record, and keeping in mind that the court must construe the facts and make reasonable inferences in favor of the non-moving party, the court nevertheless finds that Knapp acted within the scope of his discretionary authority. Knapp was at the Cedar Point Pier pursuant to a lawful order of the ADCNR when the disputed incident arose.  Although Knapp may have stated that he was there "to close the pier," such a statement arose in the context of enforcing the ADCNR order closing the surrounding waters to fishing.  The altercation between Knapp and

McRae took place during and immediately after a tense exchange regarding the ADCNR order and its parameters. This constitutes "more than a bald assertion by the defendant that the complained-of actions were undertaken pursuant to the performance of his duties and within the scope of his discretionary authority." Barker v. Norman, 651 F.2d 1107, 1124-25 (5th Cir. Unit A 1981).

### (b)   SAUCIER ANALYSIS

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Lee, 284 F.3d at 1194. To do so, McRae must meet the two-part standard set forth by the Supreme Court in Saucier v. Katz, 533 U.S. 194 (2001) and later reaffirmed in Pearson v. Callahan, 555 U.S. 223 (2009). First, McRae must allege facts which establish that Knapp violated his constitutional rights; and second, McRae must also show that the right involved was "clearly established" at the time of the putative misconduct. See id. at 232. This inquiry is "undertaken in light of the specific context of the case, not as a broad general proposition." Lee, 284 F.3d at 1194. In Pearson, the Supreme Court concluded that a court may assess these factors in any order. 555 U.S. at 236.

### (i)   WHETHER THERE WAS A CONSTITUTIONAL VIOLATION

Turning to the first prong of Saucier's two-step qualified immunity inquiry, the court must first determine whether the plaintiff's constitutional right to be free from excessive force was violated. Such claims are analyzed under the Fourth Amendment "reasonableness" standard. Graham v. M.S. Connor, et. al., 490 U.S.

11

386, 395 (1989).  Determining whether such force was "reasonable" under the Fourth Amendment requires "a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  Id. at 396 (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)) (internal quotation omitted).

In order to balance an arrestee's constitutional rights against the government's need to use some force in making an arrest, the Supreme Court has established a number of factors for lower courts to evaluate in considering claims of excessive force.  These factors include, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Id. (citing Garner at 8-9).  Additionally, under the Eleventh Circuit's test for evaluating an excessive force claim, the court must determine, "(1) the need for the application of force, (2) the relationship between the need and the amount of force used, and (3) the extent of the injury inflicted."[3]  Leslie v. Ingram, 786 F.2d 1533, 1536 (11th Cir. 1986).

In making this determination, the "reasonableness" of the use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  Graham, 490 U.S. at 395.  The "calculus of reasonableness" must embody allowance for the fact that police officers are often

---

[3] A fourth Leslie factor, a subjective inquiry into the officer's motive for using force, was invalidated by Graham.  See Lee, 284 F.3d at 1198, n. 7.

forced to make split-second judgments in tense, uncertain, and rapidly changing situations. Id. at 396-97. Nevertheless, the court also must presume that the plaintiff's version of events is true. See Hope v. Pelzer, 536 U .S. 730, 736 (2002) (The threshold inquiry is "whether plaintiff's allegations, if true, establish a constitutional violation.").

The first Graham factor, the severity of the crime, weighs heavily in McRae's favor. His alleged crimes, disorderly conduct and obstructing government operations, were of minor severity. See Doc. 74-13. Generally, "more force is appropriate for a more serious offense and less force is appropriate for a less serious one." Lee, 284 F.3d at 1198.

The second Graham factor, whether McRae was posing a threat to the safety of Knapp or others, also weighs in McRae's favor, if less heavily than the first. McRae did admit that he directed a derogatory remark at Knapp, (Doc. 70-14, p. 2), an admission he later contradicted without explanation in his deposition testimony. (Doc. 74-1, pp. 156-57). Also, Steve McRae testified that his father appeared visibly upset, (Doc. 74-2, p. 15), so much so that he felt it necessary to step between his father and Knapp. Id. at p. 13. Nevertheless, it is undisputed that Knapp was thirty years old, 6'4" tall and weighed approximately 290 pounds on the date of the altercation with McRae, who at the time was seventy-three years old, 5'7" tall and weighed 187 pounds. (Doc. 70-1, p. 2), (Doc. 74-1, p. 12), (Doc. 74-12, p. 9), (Doc. 74-15, p. 2). Despite this large physical disparity, Knapp claims in a May 7, 2012, affidavit (Doc. 70-16) that he and other ADCNR officers "understood" that McRae

13

owned a number of weapons, and that he further "understood" that McRae had been armed on the Cedar Point Pier before June 10, 2010.  This affidavit, however, is not in accordance with Fed.R.Civ.P. 56(e), which requires that "supporting and opposing affidavits shall be made on personal knowledge." (emphasis added).  "Rule 56(e)'s personal knowledge requirement prevents statements in affidavits that are based, in part, 'upon information and belief' – instead of only knowledge …" Pace v. Capobianco, 283 F.3d 1275, 1278 (11th Cir. 2002).  "Even if the affidavit is otherwise based upon personal knowledge (that is, includes a blanket statement within the first few paragraphs to the effect that the affiant has 'personal knowledge of the facts set forth in this affidavit'), a statement that the affiant believes something is not in accordance with the Rule." Id. at 1279 (citing Cermetek, Inc. v. Butler Avpak, Inc., 573 F.2d 1370, 1377 (9th Cir. 1978) (equating "I understand" statement in affidavit to inadmissible "I believe" statements)).  Thus, according to the undisputed facts, and disregarding Knapp's affidavit, there is no indication that McRae physically threatened Knapp or Ard.

The third Graham factor, whether McRae resisted arrest, clearly weighs against McRae.  By his own admission, McRae resisted when Knapp attempted to place handcuffs on him, (Doc. 70-14, p. 2), stating that he "may have instinctively jerked" his hand away from Knapp after he was ordered to place his hands behind his back.  (Doc. 74-1, p. 162).

Turning now to the Eleventh Circuit's three Leslie factors, the court finds that the first Leslie factor, the need for using force, weighs against McRae for the

14

same reasons discussed above, namely, because he admits to having resisted arrest when Knapp attempted to handcuff him.

The second <u>Leslie</u> factor, which essentially asks whether disproportionate force was used, weighs in McRae's favor.  This is a close question because the cases featuring a denial of qualified immunity contain fact patterns in which a suspect already was handcuffed and secured before the disputed application of force took place.  <u>See, e.g.</u>, <u>Lee</u>, 284 F.3d at 1198; <u>Vinyard</u>, 311 F.3d at 1348-49; <u>Phillips v. Irvin</u>, 2006 WL 1663677, *14 (11th Cir. 2006) (after subduing and handcuffing plaintiff, state trooper "violently jerked him up by the chain on the cuffs, raising his hands high behind his back and inflicting injury, all in a manner [the trooper] had been trained never to do.").  The same cannot be said of this case, where it is undisputed that McRae was not completely handcuffed when Knapp's use of force took place.  (Doc. 70-14, p. 2)  Yet, because of McRae's age and the amount of force alleged, this case is different from cases that feature a finding of <u>de minimis</u> force and a grant of qualified immunity.  <u>See, e.g.</u>, <u>Nolin</u>, 207 F.3d at 1257 (seventeen-year-old boy alleged that officers "grabbed him from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back and pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and handcuffed him."); <u>Sullivan v. City of Pembroke Pines</u>, 161 Fed. Appx. 906, 907 (11th Cir. 2006) (mother arguing with her teenage daughter refused to follow police officers orders before he  "pushed her to the ground with her hands behind her back, placed his knee on her back, and handcuffed her.");

Lewis v. Blue, 774 F.Supp.2d 1164, 1173 (11th Cir. 2011) (officer grabbed plaintiff's arm, bent it behind her back, and bent plaintiff over at the waist before placing handcuffs on her wrists, breaking her middle finger in the process).  Taking the facts as alleged by McRae to be true at the summary judgment stage, the court simply is not prepared to find that the act of physically lifting an elderly man horizontally to the ground and throwing him down onto a wooden deck constitutes de minimis force.

Finally, the third Leslie factor, the extent of the injury inflicted, clearly weighs in McRae's favor. McRae's cardiologist, F. Martin Lester, testified about McRae's extensive injuries following the altercation with Knapp, saying that McRae had "multiple abrasions .. [h]is left arm was severely abraded. The skin was pulled off.  His left leg had a huge hematoma with reddened area under the skin … His hearing aid had exploded, had to be picked out of his ear by the emergency room … He had a laceration/contusion of the wrist," and McRae's ear "looked like it was falling off."  (Doc. 74-5, pp. 16-19).

With these factors in mind, the court finds that McRae has made a sufficient showing of excessive force in violation of the Fourth Amendment.  Even assuming that Knapp had lawful authority to effect a custodial arrest for disorderly conduct and obstructing government operations, and to use some amount of force to subdue and secure McRae, the court can discern "no reason, let alone any legitimate law enforcement need" for Knapp to lift the seventy-three year old McRae into the air, horizontal to the ground, and throw him down onto the pier deck.  See Lee at 1198.

16

This conclusion is reinforced by the large physical disparity between Knapp and McRae.

### (ii)    "CLEARLY ESTABLISHED" ANALYSIS

The analysis above leads this court to conclude that the force allegedly used by Knapp was "so obviously at the very core of what the Fourth Amendment prohibits" that its unlawfulness should have been readily apparent to Knapp.  See Priester, 208 F.3d at 926.  McRae's alleged offenses were minor and he clearly did not pose a physical danger to Knapp.  Although some degree of force may have been warranted given McRae's admission that he "jerked" his hand away from Knapp when Knapp attempted to place handcuffs on McRae, see Doc. 74-1, p. 162, the grossly disproportionate force that Knapp allegedly used in this case – physically lifting an old man into the air and "slamming" him into the ground -- was clearly established as a constitutional violation because no reasonable law enforcement officer could have believed that Knapp's actions were legal.  See Lee at 1199.

Accordingly, the defendants' motion for summary judgment is **DENIED IN PART** with regard to McRae's § 1983 excessive force claim against Knapp in his individual capacity (Count Five).

### 3.)    ELEVENTH AMENDMENT IMMUNITY

The defendants argue that McRae may not bring suit against the State of Alabama or Knapp in his official capacity for a violation of § 1983 because " 'an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another state.' " Pennhurst State Sch. & Hosp. v.

<u>Halderman</u>, 465 U.S. 89, 100 (1984) (superceded by statute on other grounds) (quoting <u>Emp. of Dep't of Pub. Health and Welfare, Mo. v. Dep't of Pub. Health and Welfare, Mo.</u>, 411 U.S. 279, 280 (1973)).[4]  While state sovereign immunity is not absolute, <u>see</u> <u>In re Diaz</u>, 647 F.3d 1073, 1082 (11th Cir. 2011), a plaintiff must offer some justification that allows a federal court to entertain a private person's suit against a State.  <u>See</u> <u>Va. Office for Protection and Advocacy v. Stewart</u>, 131 S.Ct. 1632, 1638 (2011) ("[A]bsent waiver or valid abrogation, federal courts may not entertain a private person's suit against a State."); <u>Grizzle v. Kemp</u>, 634 F.3d 1314, 1319 (11th Cir. 2011) ("Pursuant to the Eleventh Amendment, a state may not be sued in federal court unless it waives its sovereign immunity or its immunity is abrogated by an act of Congress under section 5 of the Fourteenth Amendment.") (<u>citing</u> <u>Kimel v. Fla. Bd. of Regents</u>, 528 U.S. 62 (2000)).  Stated somewhat differently, a plaintiff is required to provide a cause of action against a State in which Congress abrogated state sovereign immunity under the Eleventh Amendment or where the State waived sovereign immunity.  <u>See generally</u> <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58 (1989).

McRae argues that Alabama waived the defendants' Eleventh Amendment immunity by removing this case to Federal court, and cites <u>Lapides v. Board of Regents of the University System of Georgia</u>, 535 U.S. 613.  (Doc. 73, p. 27)  But, as the defendants point out in their reply brief (Doc. 83), <u>Lapides</u> explicitly states that

---

[4] "It is also well-settled that Eleventh Amendment immunity bars suits brought in federal court when the State itself is sued and when an 'arm of the State' is sued."  <u>Manders v. Lee</u>, 338 F.3d 1304, 1308 (11th Cir. 2003) (<u>citing</u> <u>Mt. Healthy City School District Board of Education v. Doyle</u>, 428 U.S. 274, 280 (1977)).

it did not "address the scope of waiver by removal in a situation where the State's underlying sovereign immunity from suit has not been waived or abrogated in state court." <u>Lapides</u>, 535 U.S. at 617-18.  Here, Alabama has not waived its sovereign immunity in state court, nor has McRae alleged any abrogation of Alabama's sovereign immunity.  Therefore, <u>Lapides</u> is inapplicable and the removal of this case to the federal district court does not impact Alabama's Eleventh Amendment immunity.

McRae also cites <u>Monell v. Department of Social Services</u>, 436 U.S. 658 (1978), apparently to argue against the ADCNR's immunity where its allegedly "unconstitutional policy or custom" gave rise to the constitutional violations asserted in the complaint.  <u>See</u> Doc. 73, p. 28-29.  This line of argument must fail, however, because <u>Monell</u> applies only to municipalities and other local government units.  <u>Id.</u> at 690.  The ADCNR, on the other hand, is a state agency, a fact admitted by McRae in his first amended complaint, Doc. 1, p. 66, and which the <u>Monell</u> court explicitly excluded from its opinion.  <u>Monell</u> at 691, n. 54 ("Our holding today is, of course, limited to local government units which are not considered part of the State for Eleventh Amendment purposes.").

Finally, the court also notes that McRae's § 1983 claim seeks only monetary damages, and the Supreme Court has held that a State is not a "person" against whom a § 1983 claim for money damages can be asserted.  <u>Will v. Michigan Dept. of State Police</u>, 491 U.S 56, 66 (1989).

In light of the foregoing analysis, the defendants' summary judgment motion is hereby **GRANTED IN PART** with regard to McRae's § 1983 excessive force claim against the ADCNR and Knapp in his official capacity (Count Five) and **GRANTED** with regard to his § 1983 claim alleging an unconstitutional practice by the ADCNR (Count Six).

## B.   STATE LAW CLAIMS

McRae also brings state law claims for assault and battery (Count One) and false imprisonment (Count Two) by Knapp both individually and as an agent, servant, and/or employee of the ADCNR.  (Doc. 1, pp. 67-68).  McRae also alleges that the ADCNR was negligent in hiring Knapp (Count Three) and in training him (Count Four).  Id. at pp. 68-69.

### 1.)   STATE LAW CLAIMS AGAINST THE ADCNR

The defendants argue that the ADCNR enjoys absolute immunity from McRae's state law claims pursuant to Article I, Section 14 of the Alabama Constitution.  (Doc. 69, p. 27).  Indeed, "[u]nder [Article 1, § 14], the State and its agencies have absolute immunity from suit in any court." Phillips v. Thomas, 555 So.2d 81, 83 (Ala. 1989) (citing Barnes v. Dale, 530 So.2d 770, 781 (Ala. 1988); Hickman v. Dothan City Bd. of Educ., 421 So.2d 1257, 1258 (Ala. 1982); Gill v. Sewell, 356 So.2d 1196, 1198 (Ala. 1978); and Milton v. Espey, 356 So.2d 1201, 1202 (Ala. 1978)).

McRae's opposition to summary judgment is devoid of any argument which disputes the ADCNR's claim of absolute immunity from the state law claims.[5]  See Doc. 73. Therefore, the defendants' motion for summary judgment is **GRANTED** as to McRae's negligent/wanton hiring claim (Count Three) and negligent/wanton training claim (Count Four) against the ADCNR.  Furthermore, the defendants' summary judgment motion is **GRANTED IN PART** with regard to the ADCNR and Knapp in his official capacity as to Counts One and Two.

### 2.)   STATE LAW CLAIMS AGAINST KNAPP

The defendants claim that Knapp is entitled to "state agent immunity" from the state law claims asserted against him.  (Doc. 83, p. 13).  Alabama law recognizes at least two types of immunity from suit or liability for the individual executive acts of public officers.  Sheth v. Webster, 145 F.3d 1231, 1236 (11th Cir. 1998).  The first is absolute "sovereign" immunity, which is afforded to certain state constitutional officers, including sheriffs and deputy sheriffs.  Id.  The second type of immunity, described as "discretionary function" immunity, is not absolute and applies when a state officer or employee commits a tort while engaged in the exercise of a discretionary function.  Taylor v. Shoemaker, 605 So.2d 828, 831 (Ala. 1992) (citing Sellers v. Thompson, 452 So.2d 460 (Ala. 1984).

The relevant Alabama statute establishing discretionary function immunity is Ala. Code § 6-5-338(a) (1975), which reads:

---

[5] McRae's argument that "there is a genuine issue of fact as to whether [the ADCNR's use of force training] gave rise to constitutional violations" (Doc. 73, p. 29) cites Monell, which applies only to § 1983 claims against municipalities and other local government units, and not to state law claims against state agencies. Furthermore, raising the question of whether the ADCNR's use of force training conflicts with ADCNR policy does not address, much less negate, Alabama's enjoyment of absolute immunity.

> Every peace officer … who is employed or appointed pursuant to
> the Constitution or statutes of this state, whether appointed or
> employed as such peace officer by the state or a county or
> municipality thereof … shall at all times be deemed to be
> officers of this state, and as such shall have immunity from tort
> liability arising out of his or her conduct in performance of any
> discretionary function within the line and scope of his or her law
> enforcement duties.[6]

Under the discretionary function immunity analysis, the court first must determine if Knapp was performing a discretionary function when the alleged wrong occurred.  Wood v. Kesler, 323 F.3d 872, 883 (11th Cir. 2003).  Discretionary acts have been defined as "those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances." Id. at 2.  See also L.S.B. v. Howard, 659 So.2d 43, 44 (Ala. 1995). If the court finds that Knapp was performing a discretionary function, then the burden shifts to McRae to demonstrate that Knapp acted in "bad faith, with malice or willfulness."  See Wood v. Kesler, 323 F.3d 872, 883 (11th Cir. 2003); see also Sheth, 145 F.3d at 1238-39.  "Acts of such a nature are not considered to be discretionary." Wright v. Wynn, 682 So.2d 1, 2 (Ala. 1996).

Here, the court finds that Knapp's arrest of McRae was a discretionary act for immunity purposes.  Generally, arrests and attempted arrests are classified as discretionary functions.  Borders v. City of Huntsville, 875 So.2d 1168, 1178 (Ala. 2003) (citing Telfare v. City of Huntsville, 841 So.2d 1222 (Ala. 2002)).

---

[6] A conservation officer is a "police officer" under Ala. Code § 6-5-338 (1975). See Ex parte Duvall, 782 So.2d 244 (Ala. 2000).

Therefore, the burden now shifts to McRae to prove that Knapp acted in bad faith, with malice or willfulness in detaining him.  See Wood, 323 F.3d at 883.  With regard to the specific claim of false imprisonment/detention (Count Two), the evidence before the court does not support claims of willfulness, bad faith, or malice on Knapp's part.  There is no "hard and fast rule" concerning when there is probable cause to arrest a person pursuant to Alabama's disorderly conduct and obstructing government operation statutes (Ala. Code, §13A-011-007 and § 13A-010-002, respectively), see Duvall, 782 So.2d at 248, and the Alabama Supreme Court has held that an officer is entitled to discretionary-function immunity for exercising his or her judgment in whether to make an arrest.  Id. at 1179 (citing Ex parte Montgomery, 758 So.2d 565, 569 (Ala. 1999) (abrogated on other grounds by Ex parte Cranman, 792 So.2d 392, 404 (Ala. 2000)).  As discussed, supra, Knapp was at the Cedar Point Pier pursuant to a lawful order of the ADCNR when the disputed incident arose, and the altercation between Knapp and McRae took place during a tense exchange regarding that order and its parameters.  By McRae's own admission, he directed a derogatory remark at Knapp, (Doc. 70-14, p. 2), an admission he later contradicted without explanation in his deposition testimony.  (Doc. 74-1, pp. 156-57).  Also, Steve McRae testified that his father appeared visibly upset, (Doc. 74-2, p. 15), so much so that he felt it necessary to step between his father and Knapp.  Id. at p. 13.  Accordingly, Knapp is entitled to discretionary function immunity for the false imprisonment/detention claim (Count Two) brought by McRae.

The same cannot be said for the McRae's claim of assault and battery (Count One), however.  While Knapp may be entitled to discretionary function immunity for placing

McRae under arrest given the tense exchange between the two on the Cedar Point Pier, the facts as alleged by McRae do create a genuine issue of material fact as to whether Knapp's use of force was "so egregious as to amount to willful or malicious conduct or conduct engaged in in bad faith."  See Ex parte City of Tuskegee, 932 So.2d 895, 904 (Ala. 2005); see also Ex parte City of Gadsden, 781 So.2d 936, 938 (Ala. 2000).  As discussed, supra, the same factors that lead this court to deny federal qualified immunity to Knapp -- the minor severity of McRae's alleged crimes; the large physical disparity between Knapp and McRae and the miniscule physical threat that McRae posed to Knapp; the disproportionate amount of force Knapp is alleged to have used in response to McRae's "jerking" his hand away; and the extensive and severe injuries suffered by McRae – these factors, alleged by McRae and construed as true for purposes of summary judgment, could lead a reasonable jury to find that Knapp's use of force was willful, malicious, or engaged in in bad faith.

Accordingly, the defendants' motion for summary judgment is **GRANTED IN PART** as to Knapp in his individual and official capacities on Count Two of the complaint and **DENIED IN PART** as to Knapp in his individual capacity on Count One of the complaint.

## IV.   CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is **GRANTED IN PART** as to the ADCNR and Knapp in his official capacity on Count One, but **DENIED IN PART** as to Knapp in his individual capacity; **GRANTED** with regard to Count Two on the complaint; **GRANTED** with regard to Count

24

Three of the complaint; **GRANTED** with regard to Count Four of the complaint; **GRANTED IN PART** as to the ADCNR and Knapp in his official capacity on Count Five and **DENIED IN PART** with regard to Knapp in his individual capacity on Count Five of the complaint; and **GRANTED** with regard to Count Six of the complaint.  Thus, the two counts remaining before the court for trial are Count One as to Knapp in his individual capacity and Count Five as to Knapp in his individual capacity.

     **DONE** and **ORDERED** this 6th day of July 2012.

/s/  Callie V. S. Granade
UNITED STATES DISTRICT JUDGE